Filed: 11/19/14 unmodified version attached

## CERTIFIED FOR PARTIAL PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| MAUCABRINA WILLIS, | B253712 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC495910) |
| v. | |
| PRIME HEALTHCARE SERVICES, INC., | MODIFICATION ORDER |
| Defendant and Respondent. | |

The partially published opinion filed November 14, 2014, is modified as follows:

1. The footnote on page 1 is modified to delete "(D)" and replace it with "(E)".

2. On page 18, the heading is renumbered from "2." to "4.".

3. On page 21, the heading is modified to delete "2." and replace it with "C.".

4. On page 23, the heading is modified to delete "C." and replace it with "D.".

5, On page 25, the heading is modified to delete "D." and replace it with "E.".

There is no change in the judgment.


_____                    _____
TURNER, P.J.                                              KRIEGLER, J.

Filed 11/14/14 unmodified version

# CERTIFIED FOR PARTIAL PUBLICATION[*]

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| MAUCABRINA WILLIS, | B253712 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC495910) |
| v. | |
| PRIME HEALTHCARE SERVICES, INC., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, John Shepard Wiley, Jr., Judge.  Reversed in part; affirmed in part with directions.

Karasik Law Firm and Gregory N. Karasik for Plaintiff and Appellant.

Sheppard, Mullin, Richter & Hampton, Richard J. Simmons, Daniel J. McQueen and Robert Mussig for Defendant and Appellant.

---

[*]    Pursuant to California Rules of Court, rules 8.1105(c) and 8.1110, this opinion is certified for publication with the exception of part III (C)-(D).

# I. INTRODUCTION

Defendant, Prime Healthcare Services, Inc., appeals from a December 16, 2013 order denying its petition to compel arbitration and strike class claims. Plaintiff, Maucabrina Willis, cross-appeals from a December 16, 2013 order denying her Code of Civil Procedure section 128.7[1] sanctions motion. Plaintiff and defendant are subject to both individual and collective bargaining agreements. Defendant argues plaintiff is required to arbitrate her statutory claims under an individual arbitration agreement. Defendant contends the individual arbitration agreement is enforceable because it is consistent with the collective bargaining agreement. We agree with defendant and reverse the order denying defendant's petition to compel arbitration. We affirm the trial court's denial of plaintiff's sanctions motion. Upon remittitur issuance, the trial court is to compel arbitration and stay the action until completion of arbitration.

In the published portion of this opinion, we will discuss the relationship between the individual and collective bargaining agreements. The arbitration clause at issue is contained in the Fair Treatment Process (the individual agreement). Plaintiff relies upon the decision in *J.I. Case Co. v. NLRB* (1944) 321 U.S. 332, 333-339 (*J.I. Case*) and asserts the arbitration clause in the individual agreement is unenforceable. We conclude that the *J.I. Case* opinion does not permit us to refuse to enforce the arbitration clause in the individual agreement which is subject to the Federal Arbitration Act. (9 U.S.C. § 2.)

# II. BACKGROUND

## A. Class Action Complaint

On November 19, 2012, plaintiff filed a class action complaint against defendant alleging Labor Code violations for: failure to pay minimum wages; failure to pay all

---

[1] Further statutory references are to the Code of Civil Procedure unless otherwise indicated.

2

wages owed upon termination; and civil penalties for inaccurate wage statements. In addition, the complaint alleges an unfair competition cause of action in violation of Business and Professions Code section 17200 et seq. The complaint alleges plaintiff was a non-exempt clerk at Centinela Hospital Medical Center (the hospital) before being terminated by defendant on December 11, 2011. During her employment, plaintiff allegedly was not paid for all the hours she worked. The electronic system used by defendant to calculate payroll systematically computed less total hours than the actual time that plaintiff worked. As a result, plaintiff was not paid minimum wages for all the hours she worked and received inaccurate wage statements. In addition, plaintiff was not paid all wages owed to her upon termination. The complaint makes no reference to the collective bargaining agreement.

### B. Defendant's Petition To Compel Arbitration

#### 1. Overview of defendant's arguments

On August 26, 2013, defendant filed a petition to compel arbitration and dismiss the class claims. Defendant argued plaintiff was required to arbitrate her employment-related claims pursuant to her arbitration agreement with Centinela Freeman Health System. (The spelling of Centinela Freeman Health System varies at different parts of the record.) Defendant is the parent company of Prime Healthcare Centinela, LLC, which purchased the hospital from Centinela Freeman Health System. Defendant contended it was entitled to enforce the arbitration agreement because Centinela Freeman Health System assigned its interest in all agreements related to the hospital to Prime Healthcare Centinela, LLC.

3

## 2. Stipulated facts

As part of the evidence, the parties stipulated to the following undisputed facts in connection with the petition. On October 19, 2007, plaintiff was hired to work at the hospital by Centinela Freeman Health System. On October 1 and 19, 2007, plaintiff signed an employment application and employment acknowledgment form. Both forms contain provisions whereby plaintiff agreed to submit any dispute regarding her employment with Centinela Freeman Health System to binding arbitration. Also, a collective bargaining agreement between the hospital and Service Employees International Union United Healthcare Workers West (the union) governed hospital employees in specified represented bargaining units. Plaintiff worked at the hospital in a position within a bargaining unit represented by the union. She became a union member and was covered by the collective bargaining agreement.

Further, the parties stipulated effective November 1, 2007, Prime Healthcare Centinela, LLC acquired the hospital from CFHS Holdings, Inc., pursuant to an asset purchase agreement. Under the asset purchase agreement, Prime Healthcare Centinela, LLC recognized the union as the hospital representative of the bargaining units. Prime Healthcare Centinela, LLC assumed all the legal obligations of Centinela Freeman Health System with respect to the collective bargaining agreement. The collective bargaining agreement continued to govern hospital employees including plaintiff after the hospital was acquired by Prime Healthcare Centinela, LLC. The collective bargaining agreement expired on December 31, 2009, but remained in effect after its expiration. Plaintiff's employment at the hospital was terminated on December 12, 2011. On that date, the provisions set forth in article 9 of the collective bargaining agreement regarding the grievance procedure remained in effect.

4

## 3. Defendant's evidence

Defendant submitted the following documents in support of its petition: plaintiff's employment application; plaintiff's employee acknowledgment form; Centinela Freeman Health System's Fair Treatment Process, which provided for arbitration of employment-related disputes; and the asset purchase agreement between Centinela Freeman Health System's holding company, CFHS Holdings, Inc. and Prime Healthcare Centinela, LLC. The October 1, 2007 employment application with Centinela Freeman Health System, signed by plaintiff, contains the following provision: "I understand that any and all disputes regarding my employment with [Centinela Freeman Health System], including any disputes relating to the termination of my employment, are subject to the [Centinela Freeman Health System] Fair Treatment Process, which includes final and binding arbitration, and I also understand and agree, as a condition of employment and continued employment, to submit any such disputes for resolution under that process, and I further agree to abide by and accept the decision of the Arbitration panel as the final and binding decision and resolution of any such disputes I may have."

The October 19, 2007 employee acknowledgment form signed by plaintiff states in part: "In addition, I acknowledge that I have received and reviewed a copy of the [Centinela Freeman Health System] Fair Treatment Process brochure. I hereby voluntarily agree to use the Company's Fair Treatment Process and to submit to final and binding arbitration any and all claims and disputes that are related in any way to my employment or the termination of my employment with [Centinela Freeman Health System]. I understand that final and binding arbitration will be the sole and exclusive remedy for any such claim or dispute against Tenet, or its parent, subsidiary or affiliated companies or entities, and each of its and/or their employees, officers, directors or agents, and that by agreeing to the arbitration to resolve any dispute, both the Company and I agree to forego any right we each may have had to a jury trial on issues covered by the Fair Treatment Process. I also agree that such arbitration will be conducted before an experienced arbitrator chosen by me and the Company, and will be conducted under the

5

Federal Arbitration Act and the procedural rules of the American Arbitration Association ('AAA'). [¶] I further acknowledge that in exchange for my agreement to arbitrate, the Company also agrees to submit all claims and disputes it may have with me to final and binding arbitration, and that the Company further agrees that if I submit a request for binding arbitration, my maximum out-of-pocket expenses for the arbitrator and the administrative costs of the AAA will be an amount equal to one day's pay (if I am a non-exempt employee), or the local civil filing fee, whichever is less and that the Company will pay all of the remaining fees and administrative costs of the arbitrator and the AAA. I further acknowledge that this mutual agreement to arbitrate may not be modified or rescinded except by a written statement signed by both me and the Company." The references to Centinela Freeman Health System are handwritten into the employment acknowledgment form.

The Fair Treatment Process is entitled, "Tenet Open Door Policy and Fair Treatment Process." None of the evidence sheds any light on the nature of any "Tenet" entities' relationship to this case. The Fair Treatment Process provides for a five-step process that starts with informal discussion and ends with final and binding arbitration. In Step 1, the employee is required to submit the dispute to a supervisor. Step 2 allows the employee to appeal the supervisor's decision to the department head. In Step 3, the employee may appeal the department head's decision to the hospital's administration. If the dispute is not resolved, the employee may appeal to the Fair Treatment Process Committee in Step 4. If the employee does not accept the decision reached in Step 4, he or she has the right to submit the dispute to final and binding arbitration in Step 5. The Fair Treatment Process provides, "[T]he [Fair Treatment Process] does not apply to employees covered by a collective bargaining agreement, unless otherwise agreed to by such employees."

The arbitration provision in the Fair Treatment Process states: "The arbitration process is limited to disputes, claims or controversies that a court of law would be authorized or have jurisdiction over to grant relief and that in any way arise out of, relate to or are associated with your employment with the Company or the termination of your

6

employment.  In such cases, an impartial and independent arbitrator chosen by agreement of both you and the Company will be retained to make a final decision on your dispute or claim, based on application of Company policies and procedures and applicable law.  The arbitrator's decision is final and binding on you and the Company . . . ."

The Fair Treatment Process also contains the following description of the arbitration process:  "The arbitration will be heard by an independent and impartial arbitrator chosen by you and the company.  By deciding to arbitrate the dispute, you also agree that the remedy, if any, ordered by the arbitrator will be the only remedy as to all matters that are or could have been raised by you in the arbitration.  [¶]  The arbitrator's responsibility is to determine whether company policies and procedures and applicable law have been complied with in the matter submitted for arbitration.  The arbitrator shall render a written decision on the matter within 30 days after the arbitration hearing is concluded and post-hearing briefs, if any, are submitted.  [¶]  The arbitration will be administered by the American Arbitration Association ('AAA').  The company and you will share the cost of the AAA's filing fee and the arbitrator's fees and costs, but your share of such costs shall not exceed an amount equal to one day's pay for exempt employees or eight times your hourly rate for non-exempt employees or your local court civil filing fee, whichever is less.  You and the company will be responsible for the fees and costs of your own respective legal counsel, if any, and any other expenses and costs such as costs associated with witnesses or obtaining copies of hearing transcripts."

The asset purchase agreement between Prime Healthcare Centinela, LLC and CFHS Holdings, Inc. and Inglewood South Development Corp. is dated October 24, 2007.  The sellers were CFHS Holdings, Inc. and Inglewood South Development Corp.  The purchaser was Prime Healthcare Centinela, LLC.  Under the asset purchase agreement, the sellers assigned all of their interest in all contracts and agreements related to the hospital to Prime Healthcare Centinela, LLC.  Article 1, section 1.1, subdivision (d) of the asset purchase agreement provides in part:  ". . . Sellers hereby agree to sell, assign, transfer, convey and deliver to Purchaser at the Closing . . . all of [CFHS Holdings, Inc.'s] and [Inglewood South Development Corp.'s] respective right, title and

7

interest in and to the following tangible and intangible assets related to the Hospital Operations . . . : (d) All of Sellers' interest in and to all contracts and agreements related to the Hospital [and] the Hospital Operations . . . ." In addition, Prime Healthcare Centinela, LLC agreed to employ hospital employees under the asset purchase agreement. Section 5.7, subdivision (b) of the asset purchase agreement states in part: "Purchaser shall . . . offer to employ . . . all of the employees of Sellers who are involved in Hospital Operations . . . . The offers of employment shall be on the same terms and conditions (i.e. salaries, wages, job duties, titles and responsibilities, but not including severance payment or bonus provisions, if any, under executive employment contracts) provided by Sellers immediately prior to Closing." Section 5.7, subdivision (b) of the asset purchase agreement was amended on December 14, 2007. The December 14, 2007 amendment permitted Prime Healthcare Centinela, LLC to make advance offers of employment to Centinela Freeman Health System's hospital operations employees without requiring acceptances of employment.

## C. Plaintiff's Opposition

Plaintiff filed an opposition to defendant's petition to compel arbitration on September 27, 2013. She argued the collective bargaining agreement rendered the arbitration agreement with Centinela Freeman Health System inapplicable. Plaintiff contended: the private dispute resolution procedure in the Fair Treatment Process conflicted with the collective bargaining agreement; the collective bargaining agreement did not waive plaintiff's right to bring statutory claims in court; defendant did not have standing to enforce the arbitration agreement because the agreement was between her and Centinela Freeman Health System; and she never agreed to arbitrate any employment disputes with defendant.

In opposition, plaintiff submitted the collective bargaining agreement between Centinela Hospital Medical Center and the union. The collective bargaining agreement recognizes it is made not only between the contracting parties but on behalf of their

8

successors or assigns. The collective bargaining agreement was executed on September 2, 2009. However, the effective date of the collective bargaining agreement was January 1, 2007, and continued in effect until December 31, 2009. As noted, even after the December 31, 2009 expiration date, the collective bargaining agreement remained in effect. The collective bargaining agreement specifies work rules and the wage scale. The collective bargaining agreement contains no reference to the manner in which an electronic system, such as allegedly used by defendant and discussed in the complaint, was to calculate payroll.

The collective bargaining agreement contains a grievance procedure. The collective bargaining agreement defines a grievance thusly, "A grievance is defined as a dispute as to the interpretation, meaning or application of a specific provision of this Agreement." The grievance procedure specifies a three-step process for resolving disputes. Step One specifies that the employee must make a reasonable effort to resolve the dispute informally: "An Employee should make a reasonable effort to resolve the possible grievance informally in a discussion with her/his immediate supervisor. If an Employee is unable to resolve the possible grievance, the Union Steward (if requested by the Employee) and Employee will have a discussion with the immediate supervisor." There is no requirement to comply with Step One if the issue involved a disciplinary suspension or discharge.

Step Two requires that a written grievance be submitted to the "Facility's designated representative" within 15 days after the employee had notice of the grievance. Irrespective of the employee's notice, the grievance must be presented in writing within 30 calendar days after the event upon which it is based. Within 10 calendar days after receipt of the written grievance, a meeting is to be held with the "Facility's designated representative" to discuss it. The employee, the "Union Steward and the Union Representative" can be present at the meeting. Within calendar 10 days of the meeting, the designated representative is to file a response to the grievance in writing. Step Three of the grievance procedure then permits the matter to be submitted to arbitration by the union. The grievance procedure specifies the manner in which the arbitration is to an

9

occur.  All of the time limits specified in the grievance procedure are to be strictly adhered to unless mutually extended by the union and the employer.

At no time did plaintiff ever seek to enforce the grievance procedure in the collective bargaining agreement.  Defendant is not seeking to enforce the grievance procedure and arbitration provisions in the collective bargaining agreement executed on September 2, 2009.  Rather, defendant is seeking to enforce an arbitration provision pursuant to plaintiff's separate individual agreement with Centinela Freeman Health System.

## D.  Plaintiff's Monetary Sanctions Motion

On September 27, 2013, plaintiff moved for monetary sanctions against defendant "and/or" its counsel.  Plaintiff argued the petition to compel arbitration was legally and factually frivolous.  She contended the collective bargaining agreement superseded and rendered inapplicable the Centinela Freeman Health System arbitration agreement. Plaintiff argued the Centinela Freeman Health System's arbitration provisions were inconsistent with the collective bargaining agreement.  Plaintiff also asserted the collective bargaining agreement rendered defendant's factual contentions about the applicability of the Centinela Freeman Health System arbitration agreement patently frivolous.  She argued the petition to compel arbitration was brought for the improper purpose of causing unnecessary litigation delay or expense.  Plaintiff sought monetary sanctions of $15,000 pursuant to section 128.7.  Defendant filed an opposition to plaintiff's sanctions motion on December 3, 2013.  Defendant requested monetary sanctions against plaintiff for attorneys' fees incurred in opposing her motion.

## E.  Trial Court Rulings

On December 16, 2013, the trial court held a hearing on defendant's petition to compel arbitration and the parties' monetary sanctions motions.  After hearing the

10

parties' arguments, the trial court denied the petition to compel arbitration. The trial court found the individual arbitration agreement was inconsistent with the collective bargaining agreement and thus unenforceable. The trial court denied both parties' sanctions motions. The trial court explained: "It's clear to me both subjectively and objectively that counsel are just on different planets on this case. [¶] And I do believe defense counsel is completely sincere when he says I just don't see how the collective bargaining agreement gets [plaintiff] anywhere. If there's an argument to that effect, I want to hear [plaintiff] make it so I know what faulty part of it to shoot at. [¶] [Plaintiff's counsel] is indignant in his level of disagreement. That's fine, but I don't think there's sanctionable behavior going on here on either side here. This is just counsel, very able counsel, in good faith who are looking at opposite ends of the telescope."

## III. DISCUSSION

### A. The Individual Arbitration Agreement is Subject to the Federal Arbitration Act

This case is subject to the limited preemptive effect of the Federal Arbitration Act. (9 U.S.C. § 2 ["transaction involving commerce"]; *Allied-Bruce Terminix Companies, Inc. v. Dobson* (1995) 513 U.S. 265, 277 ["word 'involving,' like 'affecting,' signals an intent to exercise Congress' commerce power to the full"].) The United States Supreme Court has expressly held a wrongful death suit against a nursing home was subject to the limited preemptive effect of the Federal Arbitration Act. (*Marmet Health Care Center, Inc. v. Brown* (2012) 565 U.S. __, __ [132 S.Ct. 1201, 1203-1204]; see *Mave Enterprises, Inc. v. Travelers Indemnity Co.* (2013) 219 Cal.App.4th 1408, 1428 & fn. 6.) In addition to defendant's use of interstate commerce to purchase equipment, it receives reimbursement from Medicare payments. Payments of Medicare or Medicaid funds are transactions involving commerce. (*Summit Health, Ltd. v. Pinhas* (1991) 500 U.S. 322, 327 ["The provision of ophthalmological services affects interstate commerce because

11

both physicians and hospitals serve nonresident patients and receive reimbursement through Medicare payments."]; *United States v. Girod* (2011) 646 F.3d 304, 315 ["Medicaid . . . is a federally funded program that indisputably affects interstate commerce."]; *Thi of N.M. at Hobbs Ctr., LLC v. Spradlin* (D.N.M. 2012) 893 F.Supp.2d 1172, 1184 [receipt of Medicare funding sufficient to create jurisdiction under Federal Arbitration Act]; *Trevino v. Pechero* (S.D.Tex. 2008) 592 F.Supp.2d 939, 946 ["Plaintiffs plead a nexus with interstate commerce through their and their patients' participation in Medicare and Medicaid."]; *Miller v. Cotter* (Mass. 2007) 863 N.E.2d 537, 544 ["[A]ccepting payment from Medicare, a Federal program . . . constitutes an act in interstate commerce."].)  Further, this case involves the effect of a sale of an asset in Los Angeles County amongst Delaware corporations on a California arbitration agreement. Finally, the present dispute arises in a business venture which has entered into collective bargaining agreement subject to the Labor Management Relations Act.  (29 U.S.C. § 185(a); see *Knutsson v. KTLA, LLC* (2014) 228 Cal.App.4th 1118, 1126-1127.)  Thus, the Federal Arbitration Act controls the enforceability of the agreement to arbitrate and related standing issues.

## B.  The Individual Arbitration and Collective Bargaining Agreements

### 1.  Plaintiff's argument

Defendant challenges the trial court's ruling that the arbitration provision in plaintiff's individual agreement is unenforceable because the individual and collective bargaining agreements are inconsistent. According to plaintiff, the individual arbitration agreement cannot be enforced. Plaintiff relies upon the Supreme Court's decision upholding a cease and desist order in *J.I. Case*, *supra*, 321 U.S. at pages 333-339.  The cease and desist order was issued by the National Labor Relations Board (the board). Defendant argues there is no inconsistency between plaintiff's individual agreement and the collective bargaining agreement.  Thus, defendant argues the individual agreement

which contains the arbitration clause at issue is enforceable.  After we apply federal substantive law, including the common law developed by federal courts applicable to collective bargaining agreements, we agree with defendant.

### 2.  The role of federal common law in construing collective bargaining agreements and how they affect the workplace

At issue in part is the effect of a collective bargaining agreement pursuant to title 29 United States Code section 185(a).  Title 29 United States Code section 185(a) codifies section 301(a) of the Labor Management Relations Act. (Pub.L. No. 101 (June 23, 1947) 61 Stat. 136, 156.)  Courts typically refer to this statutory provision as section 301(a) rather than by citation to the United States Code (hereafter, section 301(a)).  Section 301(a) states in part: "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act, or between any such labor organizations, may be brought. . . ."  In many cases, section 301(a) applies to efforts to compel compliance with grievance and arbitration provisions in collective bargaining agreements.  The United States Supreme Court has explained: "Collective-bargaining contracts . . . generally contain procedures for the settlement of disputes through mutual discussion and arbitration.  These provisions are among those which are to be enforced under § 301."  (*Hines v. Anchor Motor Freight, Inc.* (1976) 424 U.S. 554, 562; see *Winston v. General Drivers, Warehousemen & Helpers* (6th Cir.1996) 93 F.3d 251, 255.)  In a moment, we will explain how the preemptive effect of section 301(a) extends beyond the mere enforcement of collective bargaining agreements.

The federal courts are charged with developing a common law that applies to the enforcement of collective bargaining agreements.  (*United Paperworkers Int'l Union v. Misco, Inc.* (1987) 484 U.S. 29, 40, fn. 9; *Textile Workers v. Lincoln Mills* (1957) 353 U.S. 448, 456-457.)  We and the federal courts have concurrent jurisdiction to enforce the provisions of section 301(a).  (*Livadas v. Bradshaw* (1994) 512 U.S. 107, 123, fn. 17;

13

*Charles Dowd Box Co., Inc. v. Courtney* (1962) 368 U.S. 502, 507.) In resolving disputes over collective bargaining agreements, we apply federal substantive law including the common law developed by federal courts. (*Livadas v. Bradshaw, supra,* 512 U.S. at p. 123, fn. 17, 114 S.Ct. 2068; *Allis-Chalmers Corp. v. Lueck* (1985) 471 U.S. 202, 209.) There is a strong federal policy favoring enforcement of collective bargaining agreements. (*Groves v. Ring Screw Works, Ferndale Fastener Div.* (1990) 498 U.S. 168, 173; *Hines v. Anchor Motor Freight, Inc., supra,* 424 U.S. p. 562.)

However, the preemptive impact of section 301(a) is not limited to enforcement of grievance procedures or other collective bargaining agreement provisions. In *Allis-Chalmers Corporation v. Lueck*, *supra*, 471 U.S. at pages 210-211, the Supreme Court described the scope of potential section 301(a) preemption: "If the policies that animate § 301 are to be given their proper range, however, the pre-emptive effect of § 301 must extend beyond suits alleging contract violations. These policies require that 'the relationships created by [a collective-bargaining] agreement' be defined by application of 'an evolving federal common law grounded in national labor policy.' [Citation.] . . . Thus, questions relating to what the parties to a labor agreement agreed, *and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law. . . .*" (Italics added; see *Evans v. Einhorn* (7th Cir. 1988) 855 F.2d 1245, 1251.) A collective bargaining agreement is more than a contract. It has been described as a "generalized code" to govern "a myriad of cases" which the parties negotiating the collective bargaining agreement could not anticipate. (*Bowen v. United States Postal Service* (1983) 459 U.S. 212, 224*; Steelworkers v. Warrior & Navigation Co.* (1960) 363 U.S. 574, 578.)

The present matter falls within the context of the myriad of cases where the issue of section 301(a) preemption and federal common law is relevant. As will be noted, *J.I. Case* does not involve an issue of the enforcement of a collective bargaining agreement. In fact, the core analysis in *J.I. Case* relates to the effect of the National Labor Relations Act, not a collective bargaining agreement provision. Yet, in decisions applying *J.I. Case*, the federal common law relating to collective bargaining agreements has been

applied.  Thus, we rely upon federal law applying provisions of collective bargaining agreements in order to determine whether the individual agreement in our case is enforceable.  The issue posited by plaintiff is that either the National Labor Relations Act or the collective bargaining agreement prevents enforcement of the individual agreement.  Once we determine the individual agreement must be enforced, then under the Federal Arbitration Act, the agreement to arbitrate will likewise be enforceable.

### 3. *J.I. Case*

We turn now to the analysis in *J.I. Case, supra,* 321 U.S. at pages 333-339.  In *J.I. Case,* the employer offered each employee a uniform one-year individual employment contract.  (*Id.* At p. 333.)  While the individual contracts were in effect, the union filed a petition for certification as a bargaining representative with the National Labor Relations Board (the board).  (*Ibid.*)  The board directed an election be conducted which was won by the union.  (*Ibid.*)  The union was certified as the exclusive bargaining representative for certain employees.  The union asked the employer to bargain.  (*Id.* at p. 334.)  The employer refused to deal with the union in any manner affecting the rights and obligations under the individual contracts while they remained in effect.  (*Ibid.*)  The board ruled the employer violated section 8 of the National Labor Relations Act by refusing to bargain collectively with the union.  (*Ibid*; 29 U.S.C. § 157; Pub.L. No. 74-198 (Jul. 5, 1935) 49 Stat. 449, 453.)  The board found the company had engaged in unfair labor practices by twice sending circulars to employees taking the position that the individual employee contracts barred union representation.  (*Id.* at p. 334.)  The board found the individual contracts and circulars impeded employees in the exercise of rights guaranteed by section 7 of the National Labor Relations Act.  (*Ibid.*; 29 U.S.C. § 157; Pub.L. No. 74-198 (Jul. 5, 1935) 49 Stat. 449, 452.)

The United States Supreme Court affirmed, with modification, a district court decree granting enforcement of the board's cease and desist order.  (*J.I. Case, supra*, 321 U.S. at pp. 334, 339-342.)  At the outset, the Supreme Court explained the role of

individual contracts in the collective bargaining context: "Collective bargaining between employer and the representatives of a unit, usually a union, results in an accord as to terms which will govern hiring and work and pay in that unit. The result is not, however, a contract of employment except in rare cases; no one has a job by reason of it and no obligation to any individual ordinarily comes into existence from it alone." (*Id*. at pp. 334-335.) Later, the Supreme Court, while discussing the role of separate individual contracts in collective bargaining cases stated, "In the sense of contracts of hiring, individual contracts between the employer and employee are not forbidden, but indeed are necessitated by the collective bargaining procedure." (*Id.* at pp. 335-336.) Other decisions have emphasized this language in *J.I. Case* concerning the legitimate role that separate contracts provide in the collective-bargaining context. (*Caterpillar Inc. v. Williams* (1987) 482 U.S. 386, 396 ["*J.I. Case* does not stand for the proposition that all individual employment contracts are subsumed into, or eliminated by, the collective-bargaining agreement"]; *Branson v. Greyhound Lines, Inc.* (5th Cir. 1997) 126 F.3d 747, 752 [In *J.I. Case*, the Supreme Court "specifically preserved the right of the employees to seek damages for the breach of their individual agreements"]; *Espinal v. Northwest Airlines* (9th Cir. 1996) 90 F.3d 1452, 1458 [the "Supreme Court long ago recognized the viability of individual hiring contracts"]; *Young v. N. Drury Lane Prods., Inc.* (7th Cir. 1996) 80 F.3d 203, 206 [a collective bargaining agreement is not a contract of employment, as employees are hired separately]; *Loewen Group Int'l, Inc. v. Haberichter* (7th Cir. 1995) 65 F.3d 1417, 1422-1423 [the collective bargaining agreement did not create an employment relationship, but one was established by an individual agreement between the employer and employee]; see *In re Roth Am., Inc.* (3d Cir. 1992) 975 F.2d 949, 954 ["'ordinarily a collective bargaining agreement . . . neither obligates any employee to perform work *nor requires the employer to provide work'*"]; *Int'l Ass'n of Machinists & Aerospace Workers v. Soo Line* (8th Cir. 1988) 850 F.2d 368, 375 ["The [Supreme] Court has stated, simply, that certain individual employment contracts may exist side-by-side with a collective-bargaining agreement"].)

16

But, in *J.I. Case*, *supra*, the Supreme Court held an individual contract cannot waive any benefit to which an employee otherwise would be entitled under a collective bargaining agreement. (*J.I. Case, supra*, 321 U.S. at p. 338.) The Supreme Court explained, "Individual contracts, no matter what the circumstances that justify their execution or what their terms, may not be availed of to defeat or delay the procedures prescribed by the National Labor Relations Act looking to collective bargaining, nor to exclude the contracting employee from a duly ascertained bargaining unit; nor may they be used to forestall bargaining *or to limit or condition the terms of the collective agreement.*" (*Id.* at p. 337; italics added.)

The Supreme Court held an employee's separate individual contract which is consistent with the collective bargaining agreement may be enforced: "We know of nothing to prevent the employee's, because he is an employee, making any contract provided it is *not inconsistent* with a collective agreement or does not amount to or result from or is not part of an unfair labor practice. But in doing so the employer may not incidentally exact or obtain any diminution of his own obligation or any increase of those of employees in the matters covered by the collective agreement." (*J.I. Case, supra*, 321 U.S. at p. 339, italics added.) Later decisions have emphasized, in varying language, that an individual contract will not be enforced when it is inconsistent with a collective bargaining agreement. (*Johnmohammadi v. Bloomingdale's, Inc.* (9th Cir. 2014) 755 F.3d 1072, 1077 ["But the Court [in *J.I. Case*] also stressed that nothing prevents an employee from making an individual contract with her employer, 'provided it is not inconsistent with a collective agreement or does not amount to or result from or is not part of an unfair labor practice.' [Citation]"]; *McNealy v. Caterpillar, Inc.* (7th Cir. 1998) 139 F.3d 1113, 1117 [individual contracts will not be enforced when they are detrimental to the collective bargaining process]; *Melanson v. United Air Lines, Inc.* (9th Cir. 1991) 931 F.2d 558, 561 [citing *J.I. Case*, a collective bargaining agreement supersedes any inconsistent individual employment contract]; *Porter v. Quillin* (1981) 123 Cal.App.3d 869, 874 ["Normally, the collective agreement takes precedence over any conflicting individual contract of employment"].)

17

As a result, in *J.I. Case*, *supra*, the Supreme Court held that the employer's reliance upon individual contracts as a ground not to bargain had no merit. In addition, the Supreme Court held the board correctly found the use of the two circulars to explain why bargaining could not occur was an unfair labor practice. (*J.I. Case, supra*, 321 U.S. at p. 339.) The Supreme Court disapproved another portion of the board's order which is not relevant to our discussion. (*Id.* at p. 340.) Nothing in the *J.I. Case* opinion discusses a duty to arbitrate under the Federal Arbitration Act.

2. The *J.I. Case* decision does not invalidate the arbitration provision in plaintiff's individual agreement.

The *J.I. Case* decision may not serve as a basis for invalidating the arbitration provision in the individual agreement. First, *J.I. Case* is of limited application here. In terms of the relation between collective bargaining and individual agreements, make no mistake, it is controlling authority. But our dispute involves a related question, the enforceability of an arbitration agreement subject to the Federal Arbitration Act. As to that issue, *J.I. Case* is of limited relevance. The United States Supreme Court has repeatedly emphasized that its decisions are not controlling authority for propositions not considered by it in the case. (*Landgraf v. USI Film Products* (1994) 511 U.S. 244, 265 ["[T]he 'maxim not to be disregarded that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used.'"]; *R.A.V. v. City of St. Paul* (1992) 505 U.S. 377, 386, fn. 5, 112 S.Ct. 2538, 120 L.Ed.2d 305 [it is "contrary to all traditions of our jurisprudence to consider the law on this point conclusively resolved by broad language in cases where the issue was not presented or even envisioned"].) In terms of the enforceability of the arbitration clause, *J.I. Case* is of limited controlling effect; there was no arbitration issue present in that litigation.

Second, as noted, the arbitration clause in our case is subject to the Federal Arbitration Act. The parties do not dispute there is a liberal federal policy favoring enforcement of arbitration clauses. (*AT&T Mobility LLC v. Concepcion* (2011) 563 U.S.

18

__, __ [131 S.Ct. 1740, 1745]; *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.* (1983) 460 U.S. 1, 24.) Thus, if there is no inconsistency in the two agreements, the arbitration provision in the individual agreement must be enforced.

Third, the two agreements are not inconsistent for our purposes. The complaint alleges an "electronic system" used to calculate payroll "systematically computed a total number of hours" that was less than that actually worked. This was because the electronic system automatically rounded the total time worked in a work period to a tenth of an hour increment but the rounding was uneven. The effect of the electronic system's "rounding" was to inaccurately state the number of hours worked.

There is nothing in the collective bargaining agreement about the electronic system or any rounding of hours worked. What is located in the collective bargaining agreement is a specification of wage rates. The collective bargaining agreement specifies rates of pay for a lab clerk, plaintiff's job, and 105 other positions. The gravamen of plaintiff's complaint is she and other potential class members did not receive proper pay because an electronic system rounded the number of hours worked to their detriment. Nothing in the individual agreement, which contains the arbitration clause, expressly refers to the use of any electronic system or the use of rounding for wage accounting purposes. No inconsistency is present in terms of the relevant language in the collective bargaining and individual agreements. But the "any dispute" language in the individual agreement covers plaintiff's statutory claims while the collective bargaining agreement does not as we will now explain.

Reference to the collective bargaining agreement to verify wage rates or assist in damage calculation is insufficient to preempt a separate agreement. This is in large measure an issue of section 301(a) preemption. Plaintiff's position is in part that the individual agreement, with its arbitration clause, cannot be enforced because of the National Labor Relations Act. That is the gist of the *J.I. Case* decision which held that individual contracts could not be used as a bar to engaging in collective bargaining. Mere reference to a collective bargaining agreement for damage computation ordinarily is insufficient to implicate section 301(a) preemption in varying circumstances. (See

19

*Livadas v. Bradshaw, supra,* 512 U.S. at p. 125 [no preemption of Lab. Code, § 203 claim because the wage rates are specified in a collective bargaining agreement]; *Burnside v. Kiewit Pacific Corp.* (9th Cir. 2007) 491 F.3d 1053, 1073-1074 [mere looking to the wage rate in a collective bargain agreement in order to calculate damages is not a basis for § 301(a) preemption of a state law claim]; *Wadsworth v. KSL Grand Wailea Resort, Inc.* (D.Hawaii 2010) 818 F.Supp.2d 1240, 1249 ["a court may look to a [collective bargaining agreement] to determine damages without triggering the need for preemption"].) This not a case which requires *interpretation* of the collective bargaining agreement which generally results in a section 301(a) preemption finding. (*Hawaiian Airlines, Inc. v. Norris* (1994) 512 U.S. 246, 261; *Foy v. Pratt & Whitney Group* (2d Cir. 1997) 127 F.3d 229, 233.) Nothing in the National Labor Relations Act, in general, or the *J.I. Case* decision, in particular, has any preemptive effect over this litigation. Thus, we conclude *J.I. Case* does no bar enforcement of the arbitration provision, which is enforceable under the Federal Arbitration Act, in the individual agreement.

Finally, in terms of our published discussion, plaintiff argues the two agreements are inconsistent because the arbitration procedures under them differ. As noted, the grievance procedure provides for a three-step process to resolve disputes. Only after Steps One and Two are unsuccessful, can arbitration occur at the request of the union and then under a specified procedure. By contrast, the individual agreement provides for arbitration under the procedural rules of the American Arbitration Association. However, as noted, the collective bargaining agreement is not implicated in plaintiff's dispute with defendant. Further, the grievance procedure, which includes the arbitration provision in the collective bargaining agreement, is limited to disputes over that document. As noted, the collective bargaining agreement defines a grievance thusly, "A grievance is defined as a dispute as to the interpretation, meaning or application of a *specific provision of this Agreement.*" (Italics added.) There is nothing in the collective bargaining agreement about the use of an electronic system to calculate hours and rounding those calculations in a manner detrimental to an employee. The complaint makes no reference to any specific provision of the collective bargaining agreement. Thus, for federal preemption

20

purposes, there is no inconsistency between plaintiff's individual agreement and the collective bargaining agreement.

One final note is on order concerning the relationship between the Federal Arbitration and National Labor Relation Acts. A developing body of arbitral and labor law opinions have discussed the procedural and substantive relationship between the Federal Arbitration and National Labor Relation Acts. (e.g. *Granite Rock Co. v. International Broth. of Teamsters* (2010) 561 U.S. 287, 299 ["We, like the Court of Appeals, discuss precedents applying the [Federal Arbitration Act] because they employ the same rules of arbitrability that govern labor cases."]; *Iskanian v. CLS Transportation Los Angeles, LLC* (2014) 59 Cal.4th 348, 373 ["[I]n light of the [Federal Arbitration Act]'s "'liberal federal policy favoring arbitration'" . . . that sections 7 and 8 the [National Labor Relation Act] do not represent 'a contrary congressional command' overriding the [Federal Arbitration Act]'s mandate."].) We need not discuss those cases as they do not directly apply the *J.I. Case* opinion to separate arbitration agreements.

[The indicated portions of the opinion that follow are deleted from publication. See *post* at page 26 where publication is to resume.]

## 2. Other Related Issues

The parties agree the collective bargaining agreement does not apply to plaintiff's statutory claims. But plaintiff contends the individual arbitration agreement is inconsistent with the collective bargaining agreement. Plaintiff reasons the arbitration clause requires arbitration of statutory disputes while the collective bargaining agreement does not allow for it. Plaintiff argues the collective bargaining agreement did not require her to arbitrate her statutory claims because there was no "clear and unmistakable waiver" by the union. Plaintiff asserts her right to pursue her statutory claims in court is a legal right that is not lost unless her union clearly and unmistakably agreed to arbitration of union employees' statutory claims. In support of her argument, plaintiff

21

relies on: *Wright v. Universal Maritime Service Corp.* (1998) 525 U.S. 70, 79-81; *Flores v. Axxis Network & Telecommunications, Inc.* (2009) 173 Cal.App.4th 802, 806; *Marcario v. County of Orange* (2007) 155 Cal.App.4th 397, 402-407; and *Vasquez v. Superior Court* (2000) 80 Cal.App.4th 420, 434-436. But these cases only address whether employees must arbitrate statutory claims under a collective bargaining agreement. None of these cases involves an employee who is subject to both individual arbitration and collective bargaining agreements. Here, the collective bargaining agreement does not require plaintiff to arbitrate her statutory claims. However, separate and apart from the collective bargaining agreement, plaintiff agreed to arbitrate her statutory claims under the individual agreement.

Plaintiff also argues the Fair Treatment Process is inapplicable to her and other union represented employees. The Fair Treatment Process states, "[The [Fair Treatment Process] does not apply to employees covered by a collective bargaining agreement, unless otherwise agreed to by such employees." But plaintiff agreed to the Fair Treatment Process as a condition of her employment. This occurred when she signed the employment application and employee acknowledgment form. As noted, plaintiff's October 1, 2007 employment application contains the following provision: "I understand that any and all disputes regarding my employment with [Centinela Freeman Health System], including any disputes relating to the termination of my employment, are subject to the [Centinela Freeman Health System] Fair Treatment Process, which includes final and binding arbitration, and I also understand and agree, as a condition of employment and continued employment, to submit any such disputes for resolution under the process, and I further agree to abide by and accept the decision of the Arbitration panel as the final and binding decision and resolution of any such disputes I may have." The October 19, 2007 employee acknowledgment form states in part: "In addition, I acknowledge that I have received and reviewed a copy of the [Centinela Freeman Health System] Fair Treatment Process brochure. I hereby voluntarily agree to use the Company's Fair Treatment Process and to submit to final and binding arbitration any and all claims and disputes that are related in any way to my employment or the termination

22

of my employment with [Centinela Freeman Health System]." Plaintiff expressly agreed to the Fair Treatment Process arbitration provision. Thus, the exclusion for employees subject to a collective bargaining agreement is inapplicable to plaintiff. We need not address the other issues raised by the parties.

## C. Defendant's Standing to Enforce Arbitration Agreement

Plaintiff argues defendant is not a party to the arbitration agreement between her and her prior employer, Centinela Freeman Health System. Plaintiff contends defendant does not have standing to enforce the arbitration agreement because it is not a signatory to the agreement. We disagree.

Under the asset purchase agreement, Centinela Freeman Health System assigned all of its interest in all contracts and agreements related to the hospital to Prime Healthcare Centinela, LLC. As noted, article 1, section 1.1, subdivision (d) of the asset purchase agreement provides in part: ". . . [S]ellers hereby agree to sell, assign, transfer, convey and deliver to Purchaser at the Closing . . . all of [CFHS Holdings, Inc.'s] and [Inglewood South Development Corp.'s] respective right, title and interest in and to the following tangible and intangible assets related to the Hospital Operations . . . : [¶] (d) All of Sellers' interest in and to all contracts and agreements related to the Hospital [and] the Hospital Operations . . . ." Plaintiff argues the arbitration agreement cannot be assigned because it does not contain a successor or assignment clause. But a contract is assignable unless the terms and purposes of the contract show it was intended not to be assignable. (*Essex Ins. Co. v. Five Star Dye House, Inc.* (2006) 38 Cal.4th 1252, 1263 ["assignability is the rule"]; *Farmland Irrigation Co. v. Dopplmaier* (1957) 48 Cal.2d 208, 222 ["The statutes in this state clearly manifest a policy in favor of the free transferability of all types of property, including rights under contracts. (Civ. Code §§ 954, 1044, 1458.)"].)

Plaintiff contends she never agreed or intended that the arbitration agreement be enforced by a successor or assignee of Centinela Freeman Health System. But plaintiff

was employed on the same terms and conditions of employment with the hospital before and after it was acquired by Prime Healthcare Centinela, LLC. One of the terms and conditions of employment with the hospital included her agreement to arbitrate her employment disputes. Under the asset purchase agreement, Prime Healthcare Centinela, LLC agreed to continue employment of the current hospital employees. Section 5.7, subdivision (b) of the asset purchase agreement states in part: "Purchaser shall . . . offer to employ . . . all of the employees of Sellers who are involved in Hospital Operations . . . . The offers of employment shall be on the same terms and conditions (i.e. salaries, wages, job duties, titles and responsibilities, but not including severance payment or bonus provisions, if any, under executive employment contracts) provided by Sellers immediately prior to Closing." Section 5.7, subdivision (b) of the asset purchase agreement was later amended on December 14, 2007. This was done to permit Prime Healthcare Centinela, LLC to make advance offers of employment to Centinela Freeman Health System's hospital operations employees without requiring acceptances of employment. The amendment did not change the terms and conditions of plaintiff's employment.

In addition, plaintiff argues defendant's status as the corporate parent of Prime Healthcare Centinela, LLC does not confer standing to enforce the arbitration agreement. But Prime Healthcare Centinela, LLC, as the assignee, assumed the rights and duties of the assignor, Centinela Freeman Health System. (*Creative Ventures, LLC v. Jim Ward & Associates* (2011) 195 Cal.App.4th 1430, 1447; *Royal Bank Export Finance Co. v. Bestways Distributing Co.* (1991) 229 Cal.App.3d 764, 768.) Plaintiff contends the only parent corporation that is a third party beneficiary under the arbitration agreement is Tenet. The October 19, 2007 employee acknowledgment form signed by plaintiff states in part, "I understand that final and binding arbitration will be the sole and exclusive remedy for any such claim or dispute against Tenet, or its parent, subsidiary or affiliated companies or entities, and each of its and/or their employees, officers, directors or agents . . . ." The arbitration agreement identifies Tenet, the parent corporation of Centinela Freeman Health System. But, as an intended beneficiary, this does not mean

24

defendant has no standing to seek enforcement of the arbitration agreement, as the corporate parent of Prime Healthcare Centinela, LLC. Under the arbitration agreement, Centinela Freeman Health System's parent, subsidiary, affiliated companies or entities may enforce the agreement. Prime Healthcare Centinela, LLC has succeeded to the rights and duties of Centinela Freeman Health System. It follows that defendant as the parent corporation of Prime Healthcare Centinela, LLC has standing to enforce the arbitration agreement.

Finally, under the Federal Arbitration Act, the assignee of a party to an arbitration clause may enforce that agreement. (*Koch v. Compucredit Corp.* (8th Cir. 2008) 543 F.3d 460, 466-467; *Britton v. Co-op Banking Group* (9th Cir. 1993) 4 F.3d 742, 746; *DMS Services, LLC v. Superior Court* (2012) 205 Cal.App.4th 1346, 1355.) Likewise, equitable estoppel principles permit a non-signatory to a contract, such as defendant, to enforce an arbitration clause. (*Crawford Professional Drugs, Inc. v. CVS Caremark Corp.* (5th Cir. 2014) 748 F.3d 249, 255, 259-262 & fn. 9; see *Arthur Andersen LLP v. Carlisle* (2009) 556 U.S. 624, 630-632.) There is no merit to plaintiff's standing contention.


### D. Plaintiff's Cross-Appeal of the Denial of Her Sanctions Motion


Plaintiff cross-appeals from the trial court's order denying her motion for sanctions. Under section 128.7, the moving party must show the challenged conduct is objectively unreasonable. (*Peake v. Underwood* (2014) 227 Cal.App.4th 428, 440; *Guillemin v. Stein* (2002) 104 Cal.App.4th 156, 167.) The trial court's ruling is reviewed for an abuse of discretion. (*Peake v. Underwood, supra,* 227 Cal.App.4th at p. 441; *Guillemin v. Stein, supra,* 104 Cal.App.4th at p. 167.) Defendant was entitled to compel arbitration of the plaintiff's statutory claims under the individual arbitration agreement. The trial court did not abuse its discretion in denying the sanctions motion.

25

[The balance of the opinion is to be published.]

## IV.  DISPOSITION

The order denying the petition to compel arbitration is reversed.  The order denying the sanctions motion is affirmed.  Defendant, Prime Healthcare Services, Inc., is to recover its costs incurred on appeal from plaintiff, Maucabrina Willis.  Upon remittitur issuance, the trial court is to compel arbitration as discussed in the body of this opinion and stay the action until completion of arbitration.

CERTIFIED FOR PARTIAL PUBLICATION

TURNER, P. J.

We concur:

KRIEGLER, J.

MINK, J.[*]

---

[*]Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.