Filed 3/13/24  In re J.W. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re J.W., a Person Coming Under the Juvenile Court Law. | B327965<br>(Los Angeles County Super. Ct. No. 23CCJP00424) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>STEPHANIE M.,<br><br>Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles, Daniel Zeke Zeidler, Judge.  Affirmed.

William Hook, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Erica Edelman-Benadon, Senior Deputy County Counsel, for Plaintiff and Respondent.

_____

Stephanie M. (Mother) appeals from a jurisdiction finding and disposition order declaring her son, J.W., a dependent of the juvenile court after the court sustained a petition pursuant to Welfare and Institutions Code section 300, subdivisions (a) and (b)(1).[1] Mother contends there was insufficient evidence to support the court's jurisdiction finding that the domestic violence between Mother and her ex-boyfriend, Jose C., placed J.W. at substantial risk of harm. Mother also argues the court abused its discretion by ordering her to attend a domestic violence support group for victims. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Referral and Investigation*

On February 1, 2023 the Los Angeles County Department of Children and Family Services (Department) received a referral stating Mother had been arrested for inflicting corporal injury on 10-year-old J.W. During an interview with a Department social worker the night of the incident, J.W. explained he had been sitting in the back seat of Mother's car while she was driving when Mother received a text message from J.W.'s teacher.

_____

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

2

Mother became angry, yelled at J.W., and called him names. She then stopped the car, turned around to the back seat, and hit J.W. with a phone charger two or three times on his arms, legs, and hand. Mother then grabbed her cell phone and hit J.W. twice on the head with the phone. J.W. got out of the car and ran into a store for help, at which point the police were called. J.W. had red marks on his arms and legs that were consistent with being hit with a phone charger. J.W. told the social worker there had been previous incidents when Mother hit him with a phone charger and a wooden spatula. J.W. was scared of Mother. J.W. also reported Mother had a boyfriend but she had instructed him not to say anything about the boyfriend.

The social worker interviewed Mother while she was in custody. Mother admitted she had gotten angry after receiving a text message from J.W.'s teacher and yelled at J.W. But Mother claimed J.W. was lying about the incident, and the red marks on his arms and legs were from playing with his friends. Mother disciplined J.W. by spanking him, but she denied ever hitting him with an object.

B.    *The Petition and Detention*

On February 3, 2023 the Department filed a petition under section 300, subdivisions (a) and (b)(1), asserting identical allegations that Mother had physically abused J.W. on more than one occasion, including hitting him with the phone charger and phone. The petition alleged the excessive physical abuse endangered J.W.'s physical health and safety, placed him at risk of serious physical harm, and caused unreasonable pain and suffering. In addition, J.W. was afraid of Mother.

3

J.W. was detained from Mother.[2]  The juvenile court ordered monitored visitation for Mother for a minimum of four hours per week.

C.      *The Jurisdiction and Disposition Report*

The March 2, 2023 jurisdiction and disposition report summarized additional interviews with Mother and J.W.  J.W.'s account of the February 1 incident remained substantially unchanged, but he now denied Mother had ever hit him before that night.  He also stated Mother no longer had a boyfriend.

Mother no longer denied hitting J.W. on February 1, but she claimed she had spanked him with an open hand and did not realize she was holding her phone and charger.  Mother continued to downplay the incident by stating J.W. had a habit of lying.

Mother told the social worker she had been in an abusive relationship with Jose that ended a few years earlier.  She was evasive about the details and claimed she was no longer in contact with Jose.  An addendum report provided additional details regarding a September 2020 domestic violence incident between Mother and Jose.  According to the police report, Jose and Mother got into an argument because Jose had not been paying rent for the apartment they shared.  Jose punched Mother twice in the head and choked her until she lost consciousness.  When she woke up, J.W. was staring at her from his bedroom.  Mother called the police, and Jose was arrested.

---

[2]      The juvenile court found Jeffrey W. was the alleged father of J.W.  The Department conducted due diligence to locate Jeffrey but was unable to find him.

4

J.W. told the responding police officers that he had been asleep and did not see the fight. However, he heard Mother shouting "move out" and "call the cops."

Mother refused an emergency protective order, stating she would go to court if she needed one. She told the responding police officers Jose had been arrested for domestic violence earlier that year and she had been given a domestic violence resource pamphlet, but Jose had thrown it away.

Jose was convicted of misdemeanor battery of a spouse or significant other (Pen. Code, § 243, subd. (e)(1)).[3] The criminal court issued a protective order prohibiting Jose from having any contact with Mother or coming within 100 yards of her. The protective order expires in July 2024.

When the Department social worker asked Mother about the 2020 domestic violence incident, she denied that J.W. had been present. She stated Jose had been a good father figure to J.W. but they were not still in contact. Mother believed the restraining order had expired.

J.W. appeared hesitant to talk about Jose with the social worker, stating he did not want to get Mother into trouble. When asked about the restraining order, J.W. said he believed it expired later in 2023, at which point Mother and Jose could get back together.

Jose told the social worker he was still in contact with Mother but they were no longer in a relationship. He continued to see J.W., but not often.

---

[3]    As part of his sentence, Jose was ordered to complete a 52-week domestic violence treatment program. The record does not indicate whether he did.

During the investigation, the social worker interviewed the principal at J.W.'s school. The principal stated that J.W.'s "stepdad" had picked J.W. up from school a couple of times and one time had a "pretty heated" confrontation with J.W.'s teacher, Ms. Esparza, after which the teacher was "pretty shaken up."

In a subsequent interview with the social worker, Esparza explained she had seen Jose at school approximately three times.[4] The last time she had seen him, in October 2022, he was picking up J.W. from school. Esparza asked J.W. to wait with her at dismissal so she could speak with his mother. However, instead of Mother, Jose arrived to pick up J.W. Jose began calling for J.W. to come to the car. Jose "was very upset yelling at the top of his lungs from his car for [J.W.] to come." Esparza asked another teacher to walk with her to the car because Jose appeared to be aggressive. When Esparza attempted to speak with Jose, Jose yelled, "I don't care" and "Talk to his mom." Esparza was uncomfortable and did not speak to him further. The next day Mother came to the school and apologized to Esparza.

When the social worker asked J.W. about the October 2022 incident, J.W. said Jose "was only mad that one time when he picked me up." Mother denied Jose had picked J.W. up from school. She insisted it had been another friend of hers who yelled at the teacher. Mother added that she had been in the car at the time.

---

[4] The Department social worker showed Esparza a picture of Jose, and Esparza stated he "looks like" the individual who had picked J.W. up from school.

D.    *The First Amended Petition*

On March 13, 2023 the Department filed a first amended petition containing the allegations from the initial petition and adding allegations pursuant to section 300, subdivisions (a) and (b)(1), that J.W. had been exposed to domestic violence between Mother and Jose in September 2020 and Mother had allowed Jose to have contact with J.W. despite Jose's criminal conviction and the restraining order. The first amended petition alleged Mother had failed to protect J.W. by allowing Jose to have contact with him, which placed J.W. at risk of physical and emotional harm.

E.    *The Jurisdiction and Disposition Hearing*

At the March 14, 2023 jurisdiction and disposition hearing, the juvenile court struck the allegation brought under section 300, subdivision (a), with respect to the September 2020 incident and sustained the remaining allegations.[5] The court declared J.W. a dependent of the court and removed him from Mother's custody. The court ordered monitored visitation for Mother. The court required Mother to attend parenting classes, individual counseling, conjoint counseling if recommended by J.W.'s therapist, and a domestic violence support group for victims. The court also ordered J.W. to have no contact with Jose. Mother timely appealed.

---

[5]    The juvenile court also amended the petition by interlineation to remove references to Mother's arrest after the February 2023 physical abuse incident.

**DISCUSSION**

A.     *Governing Law and Standard of Review*

Section 300, subdivision (a), provides that jurisdiction may be assumed if "[t]he child has suffered, or there is a substantial risk the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian." "Nonaccidental" generally means a parent or guardian "acted intentionally or willfully." (*In re R.T.* (2017) 3 Cal.5th 622, 629 (*R.T.*).)

As relevant here, section 300, subdivision (b)(1), authorizes the juvenile court to assume jurisdiction when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of any of the following:  [¶]  (A)  The failure or inability of the child's parent or guardian to adequately supervise or protect the child.  [¶]  (B) The willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left."[6]

"A jurisdiction finding under section 300, subdivision (b)(1), requires the Department to prove three elements: (1) the parent's or guardian's neglectful conduct or failure or inability to protect

---

[6]     Section 300, subdivision (b)(1)(C) and (D), also provides for jurisdiction when there is a substantial risk the child will suffer serious physical harm or illness as a result of "[t]he willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment" or "[t]he inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse."

8

the child; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness." (*In re Cole L.* (2021) 70 Cal.App.5th 591, 601 (*Cole L.*); accord, *In re L.W.* (2019) 32 Cal.App.5th 840, 848; see *R.T., supra*, 3 Cal.5th at p. 624 ["section 300(b)(1) authorizes dependency jurisdiction without a finding that a parent is at fault or blameworthy for her failure or inability to supervise or protect her child"].)

"Although section 300 requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing [citations], the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child." (*Cole L., supra*, 70 Cal.App.5th at pp. 601- 602; accord, *In re L.O.* (2021) 67 Cal.App.5th 227, 238 ["'Although there must be a present risk of harm to the minor, the juvenile court may consider past events to determine whether the child is presently in need of juvenile court protection.'"].) "A parent's '"[p]ast conduct may be probative of current conditions" if there is reason to believe that the conduct will continue.'" (*Cole L.*, at p. 602; accord, *In re J.A.* (2020) 47 Cal.App.5th 1036, 1048.)

Upon finding a child is a dependent of the juvenile court, the court "may direct any reasonable orders to the parents . . . as the court deems necessary and proper," including requiring participation in counseling, education and treatment programs. (§ 362, subd. (d); see *In re Briana V.* (2015) 236 Cal.App.4th 297, 311 ["'[t]he juvenile court has broad discretion to determine what would best serve and protect the child's interests and to fashion a dispositional order accordingly'"]; *In re Daniel B.* (2014) 231 Cal.App.4th 633, 673 [same].)

We review the juvenile court's jurisdiction findings for substantial evidence in light of the whole record. (*In re I.C.*

9

(2018) 4 Cal.5th 869, 892; *R.T., supra*, 3 Cal.5th at p. 633 ["'In reviewing the jurisdictional findings and disposition, we look to see if substantial evidence, contradicted or uncontradicted, supports them.'"].) Substantial evidence is "evidence which is reasonable, credible, and of solid value." (*In re I.C.*, at p. 892; accord, *Cole L., supra*, 70 Cal.App.5th at p. 602.) "'[W]e draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.'" (*R.T.*, at p. 633; accord, *In re I.J.* (2013) 56 Cal.4th 766, 773; *Cole L.*, at p. 602 ["while substantial evidence may consist of inferences, any inferences must rest on the evidence; inferences based on speculation or conjecture cannot support a finding"].) "The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or orders." (*In re E.E.* (2020) 49 Cal.App.5th 195, 206; accord, *In re D.B.* (2018) 26 Cal.App.5th 320, 328-329.)

We review the juvenile court's disposition orders, including those directing a parent to participate in counseling, education and treatment programs, for an abuse of discretion. (*In re K.T.* (2020) 49 Cal.App.5th 20, 25; *In re D.P.* (2020) 44 Cal.App.5th 1058, 1071; *In re Briana V., supra*, 236 Cal.App.4th at p. 311.)

B.     *Substantial Evidence Supports the Domestic Violence Finding Under Section 300, Subdivision (b)(1)*

Exposure to domestic violence, even absent the threat of nonaccidental injury, may serve as the basis for dependency jurisdiction pursuant to section 300, subdivision (b)(1). (See *In re T.V.* (2013) 217 Cal.App.4th 126, 135 ["[e]ven though [the child]

10

had not been physically harmed, the cycle of violence between the parents constituted a failure to protect her"]; *In re R.C.* (2012) 210 Cal.App.4th 930, 942 [""Both common sense and expert opinion indicate spousal abuse is detrimental to children.""]; *In re S.O.* (2002) 103 Cal.App.4th 453, 460-461 ["'domestic violence in the same household where children are living is neglect; it is a failure to protect [them] from the substantial risk of encountering the violence and suffering serious physical harm or illness from it'"].)

Mother does not deny she was the victim of Jose's domestic violence in September 2020. Nonetheless, Mother argues the evidence did not establish J.W. was at current risk of harm at the time of the jurisdiction hearing because the domestic violence incident occurred more than two years earlier, she was no longer in a relationship with Jose, she had appropriately protected J.W. after the incident, and she had been "honest and insightful" with the Department.[7] The evidence, construed in a light most

---

[7] Mother acknowledges that the unchallenged jurisdiction findings regarding her physical abuse of J.W. provide independent bases for affirming dependency jurisdiction over J.W. regardless of any alleged error in the finding of domestic violence. (See *In re D.P.* (2023) 14 Cal.5th 266, 283-284 ["where there are multiple findings against one parent[,] the validity of one finding may render moot the parent's attempt to challenge the others"]; *In re M.W.* (2015) 238 Cal.App.4th 1444, 1452 ["As a general rule, a single jurisdictional finding supported by substantial evidence is sufficient to support jurisdiction and render moot a challenge to the other findings."].) As the Supreme Court recently held in *In re D.P.*, at page 283, "where a jurisdictional finding 'serves as the basis for dispositional orders that are also challenged on appeal' [citation], the appeal is not moot." Because the jurisdiction finding of domestic violence

11

favorable to the juvenile court's determinations (see *R.T., supra*, 3 Cal.5th at p. 633), does not support Mother's contentions.

While it is true the domestic violence incident occurred more than two years before the jurisdiction hearing, it was a significant incident that happened while J.W. was in the home and resulted in Mother's loss of consciousness and Jose's arrest and criminal conviction. Rather than take appropriate steps to protect J.W. after the incident, Mother refused an emergency protective order—in fact, the current protective order was not sought by Mother but was entered as a result of Jose's criminal conviction. Mother assisted Jose in violating the protective order by maintaining contact with him. Further, Mother fails to acknowledge Jose's more recent aggressive behavior in which he yelled at J.W.'s teacher in front of J.W. Finally, Mother has not been "honest and insightful" with the Department; to the contrary, she denied J.W. was present for the 2020 domestic violence incident, denied Jose picked up J.W. from school in October 2022 and yelled at the teacher, gave conflicting information regarding her physical abuse of J.W., and accused J.W. of lying. Mother also stated she did not need domestic violence counseling and could protect J.W., prompting the social worker to conclude Mother did not understand the impact of allowing Jose to have contact with J.W. and she had "very little insight into her protective capacities."

Based on the totality of the circumstances, substantial evidence supports the juvenile court's conclusion J.W. was at risk

---

serves, at least in part, as the basis of the disposition order requiring Mother to attend domestic violence counseling, her challenge to the findings is not moot. We therefore consider the merits of Mother's appeal.

of continued exposure to domestic violence.  (See *In re J.K.* (2009) 174 Cal.App.4th 1426, 1439-1440 [father's physical abuse occurring two years before jurisdiction hearing was "not so remote that it can be ignored" where father had taken no steps to address behavior, incident was severe, and mother repeatedly failed to protect child from father]; see also *In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197 ["[o]ne cannot correct a problem one fails to acknowledge"].)

C.    *The Juvenile Court Did Not Abuse Its Discretion in Requiring Mother To Attend a Domestic Violence Support Group*

Mother contends the juvenile court abused its discretion in ordering her to attend a domestic violence support group because J.W. was not at risk of harm due to domestic violence and the requirement will make it more difficult for Mother to reunify with J.W.  The court did not abuse its discretion.

"Juvenile courts should be mindful of the burdens their disposition orders impose on parents already grappling with difficult conditions and circumstances.  However, the paramount concern always must be the child's best interests, and we cannot reverse a disposition order reasonably fashioned to eliminate the conditions that led to dependency jurisdiction, no matter how burdensome its requirements may seem from the parent's perspective."  (*In re D.P., supra,* 44 Cal.App.5th at pp. 1071-1072.)

As discussed, substantial evidence supports the juvenile court's finding that J.W. was at substantial risk of harm based on the domestic violence between Mother and Jose.  Accordingly, requiring attendance in a domestic violence support group was a reasonable requirement to protect J.W., especially considering

13

Mother's failure to comprehend the detriment that exposure to Jose and any further domestic violence could have on J.W.

## DISPOSITION

The juvenile court's jurisdiction finding and disposition order are affirmed.

FEUER, J.

We concur:

SEGAL, Acting P. J.

MARTINEZ, J.